Leon J. MODROWSKI, Petitioner,

v.

**DEPARTMENT OF VETERANS AFFAIRS, Respondent.**

No. 00–3311.

United States Court of Appeals,
Federal Circuit.

June 13, 2001.

Kenneth P. Dobbs, Kenneth Dobbs Law Offices, of Chicago, IL, argued for petitioner.

Marian E. Sullivan, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for respondent. With her on the brief were David M. Cohen, Director; and Bryant G. Snee, Assistant Director. Of counsel on the brief was Gregory Burke, Attorney, Office of Regional Counsel, Department of Veterans Affairs, Hines, IL.

Before MAYER, Chief Judge, MICHEL and CLEVENGER, Circuit Judges.

MICHEL, Circuit Judge.

This is a federal employment case. Leon Modrowski petitions for review of the June 24, 1999 decision of the Merit Systems Protection Board ("Board") affirming the decision of the Department of Veterans Affairs ("DVA," or "agency") to remove him from federal service. *Modrowski v. DVA,* No. CH–0752–98–0126–I–1 (M.S.P.B. June 24, 1999). The Board's decision became final on March 16, 2000 upon the Board's denial of Modrowski's petition for review. Modrowski filed a timely petition for review with this court under 5 U.S.C. § 7703 (1994), and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9) (1994). We heard oral argument in this appeal on May 10, 2001. We affirm the Board's decision to sustain two charges: (1) that Modrowski violated conflict of interest rules by participating in the sale of agency-owned property to his son-in-law, and (2) that he knowingly concealed such information from the agency, in violation of agency rules of conduct for employees. However, because we conclude that Modrowski was improperly denied an adequate opportunity to consult with his lawyer about the effective scope of a purported grant of prosecutorial immunity before being compelled to answer questions or be removed, we reverse the Board's decision sustaining the third charge: refusal to cooperate in the agency's investigation. Because it is unclear what penalty would have been imposed for only the two charges here affirmed, we vacate the Board's decision sustaining his removal. Accordingly, we affirm-in-part, reverse-in-part, vacate-in-part, and remand for further proceedings.

## Facts

### A. The Unauthorized Sales to Modrowski's Son–in–Law

Until his removal, Modrowski was employed as a GS–12 Senior Realty Specialist with the DVA's Regional Office in Chicago, Illinois. Modrowski's duties involved processing sales of DVA-owned real estate. It is undisputed that Modrowski participated in the sale of two agency-owned houses to his son-in-law, Ronald Perzanowski, by authorizing the payment of brokerage fees for both sales. One house, which Perzanowski purchased on March 20, 1992, is in Coal City, Illinois. The second house, purchased on August 9, 1996, is in Thornton, Illinois.

The DVA prohibits unauthorized sales of agency property to "VA affiliates." Veterans Benefits Administration Manual 26–5, ¶ 3.03. DVA property may be sold to VA affiliates, but only if specified procedures are followed. It is undisputed that such procedures were not followed in this case. At the time of the incidents in question, the Manual defined "VA affiliates" as "VA employees assigned to stations having Loan Guaranty Divisions and *close members of their families.*" *Id.* (promulgated January 26, 1988) ("1988 Manual") (emphasis added). The 1988 Manual states that the policy behind this rule is "to minimize the possibility of criticism arising out of the sale of VA-owned properties to VA employees and other VA affiliates." *Id.* We will refer to this rule as the "VA affiliates" rule, notwithstanding the subsequent change in the name of the agency from Veterans Administration ("VA") to the DVA.

The DVA later amended its VA affiliates rule concerning the disposition of VA-owned property to specify that VA affiliates include "[s]pouses, parents, *in-laws,* children, step-children, brothers and sisters of, and *persons who reside with,* any of the above." Veterans Benefits Administration Manual 26–5, ¶ 3.03 (promulgated October 20, 1996) ("1996 Manual") (emphasis added). The stated policy behind this rule is essentially the same as that set forth in the 1988 Manual.

## B. The DVA's Investigation of Modrowski

In early 1997, the DVA initiated an investigation of Modrowski. The record indicates that the investigation originally targeted Modrowski's suspected participation in criminal acts, particularly theft of property from DVA-owned houses, vandalism, and illegal issuance of checks. While it is unclear if any evidence of such crimes was uncovered, the DVA did learn through the investigation that Modrowski

had participated in the sale of two DVA-owned houses to his son-in-law, and that the sales were not conducted in accordance with established procedures for conveyances to DVA affiliates, as would require special authorization.

On July 9, 1997, Ronald Rogala, a Loan Guaranty Officer employed by the DVA, first confronted Modrowski concerning his participation in the sale of real estate to Perzanowski. Modrowski contends that he was presented with documentary evidence of "criminal and/or ethical violations." Rogala advised Modrowski to seek representation. Modrowski did not respond to the accusations.

Two days later, on July 11, 1997, Modrowski was again questioned by Rogala. This time Modrowski was accompanied by Helmut Matthies, Modrowski's union representative. According to testimony elicited during the hearing before the Board, Modrowski refused to answer Rogala's questions and invoked the Fifth Amendment.

Thereafter, DVA officials informed the local United States Attorney's Office of the situation, and ascertained that the U.S. Attorney declined to prosecute Modrowski. On July 30, 1997, Rogala sent Modrowski a letter on DVA letterhead, signed by himself, stating as follows:

1. The U.S. Attorney has been apprised of the situation, granted you immunity and has declined to prosecute you in the matter of the purchase of two properties by Ronald Perzanowski.

2. You are hereby notified your assertion of your Fifth Amendment rights is unnecessary since you will not be prosecuted.

3. You are therefore ordered to respond to my questions concerning this matter.

The very next day, July 31, 1997, Rogala questioned Modrowski for a third time. After Modrowski persisted in his refusal to respond to Rogala's questioning, Rogala terminated the meeting.

The following week, on August 6, 1997, Rogala interrogated Modrowski for a fourth time in pursuit of the investigation. According to his testimony before the Board, Modrowski informed Rogala that he had made an appointment to meet with an attorney on August 8, 1997, and that he would not respond to Rogala's questions until after such consultation. It is undisputed that Modrowski did meet with his attorney on August 8, 1997. Why questioning did not resume after this consultation is unclear.

On August 22, 1997, however, apparently without any further questioning, Rogala sent Modrowski a letter proposing to remove him from his position with the DVA. As to each sale of property, the agency charged Modrowski with participating in relationships with those seeking contracts that would be contrary to the best interests of the agency and its customers, and intentionally concealing a material fact in connection with his employment. The agency also set forth two charges for refusing to cooperate, i.e., answering questions, in the investigative proceedings on July 31, 1997 and August 6, 1997, respectively.

On August 27, 1997, Modrowski sent Rogala a response letter stating that his mental health had been "seriously impaired," and that his attorney was on vacation. Accordingly, he stated that "I surely need competent legal counsel to guide me through the purported allegations." He

requested "an additional 30 calendar days to digest the content of the evidence file, and prepare a proper response." The record does not reveal any response to this request for a delay. In any event, on September 4, 1997, Modrowski sent Rogala an additional memorandum responding to the letter of proposed removal. Concerning the conflict of interest charges, Modrowski denied knowingly participating in the sale of the properties to Perzanowski. Moreover, Modrowski asserted that selling the properties to his son-in-law did not constitute an unauthorized sale to a "close member[ ] of [his] famil[y]," as proscribed by the 1988 Manual. Regarding his alleged refusal to cooperate, Modrowski asserted that he was not able to meet with his lawyer until August 8, and that he was thus under no obligation to respond to Rogala's questions on pain of dismissal for refusal to answer until thereafter.

Soon thereafter, Montgomery Watson, the Director of the DVA's Regional Office in Chicago and the Deciding Official in this case, called Modrowski on the phone, in the presence of Helmut Matthies. In the brief exchange, according to Watson's later testimony, Modrowski insisted that he "had not done anything wrong," and thus that the charges and inquiry were improper. On September 29, 1997, Watson sent Modrowski a letter stating that a decision had been made to remove him from employment based on a finding that "[e]ach of the twelve reasons stated in the notice of proposed removal is sustained." [1] The removal became effective October 6, 1997. Modrowski timely appealed to the Board.

---

1. The agency originally charged Modrowski with twelve offenses: four counts of violations of conflict of interest rules and one charge of intentional concealment of material information for each of the two sales to Perzanowski, and two counts of refusal to cooperate, for the

July 31 and August 6, 1997 proceedings, respectively. The AJ merged the charges into a single conflict of interest charge, a single intentional concealment charge, and two charges of refusal to cooperate.

## Discussion

### A. Standard of Review

■ The scope of judicial review of decisions of the Board is defined narrowly and limited by statute. Specifically, this court must affirm the Board's decision unless it finds the decision to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law, rule or regulation having been followed; or unsupported by substantial evidence. 5 U.S.C. § 7703(c) (1994); *Kewley v. Dep't of Health & Human Servs.*, 153 F.3d 1357, 1361 (Fed.Cir.1998). Pursuant to this standard of review, this court does not substitute its own judgment for that of the Board, particularly as to choice of penalty. *Phillips v. United States Postal Serv.*, 695 F.2d 1389, 1390 (Fed.Cir.1982).

### B. Participation in Relationships Contrary to the Best Interests of the Agency

The DVA asserts that by participating in the sale of the properties at issue to his son-in-law, Modrowski participated "in relationships ... contrary to the best interests of the agency." Sustaining this charge requires determining whether the agency properly interpreted the "VA affiliates" rule in the 1988 Manual to prohibit unauthorized sales of agency-owned property to in-laws of DVA employees. As noted above, the 1988 Manual bars unauthorized sales of agency-owned properties to "VA affiliates," defined as "VA employees assigned to stations having Loan Guaranty Divisions and *close members of their families.*" 1988 Manual 26–5, ¶ 3.03 (emphasis added).

■ The purpose and wording of the "VA affiliates" rule is expressly set forth within the rule itself: "to minimize the possibility of criticism arising out of the sale of VA-owned properties to VA employees and other VA affiliates." *Id.* It is undisputed on appeal that the 1988 version of the rule prohibited the unauthorized sale of DVA-owned property to sons and daughters of DVA employees. It is also undisputed that Modrowski's daughter, Bernadette, who was married to Perzanowski, lived together with him in the houses he purchased from the DVA. From the perspective of potential harm to the DVA's reputation, we see little difference in whether the houses were sold to the son-in-law or directly to the daughter. In either case, the DVA would be susceptible to public criticism for self-dealing. We agree with the Board that it is correct for the DVA to interpret its "VA affiliates" rule to prohibit the sale of DVA-owned property to in-laws.

■ Modrowski urges that the 1996 amendments to the Manual dictate a contrary interpretation. As noted above, the "VA affiliates" rule was amended in 1996 to explicitly recite in-laws. Modrowski argues that this amendment expanded the scope of the rule by *adding* in-laws, and thus that the 1988 version must be interpreted to exclude sales to in-laws. We note that the 1996 amendment specifies family members such as "spouses," "parents," and "children," who would have been covered by the broadly-written 1988 rule (*i.e.,* "close family members"). Thus, we reject the notion that all the family members specified in the 1996 amendments were necessarily *added* to the scope of the earlier rule. Rather, we conclude that the 1996 version merely *clarified* the scope of the 1988 version, and does not preclude interpreting the earlier version to cover in-laws.

■ Modrowski had a small role in the sale of the properties to Perzanowski—it appears that his only official duty was to authorize the payment of brokerage fees. Nonetheless, the parties do not dispute that this level of participation was suffi-

cient to trigger a violation of the "VA affiliates" rule. Because we rule that the agency properly interpreted its 1988 "VA affiliates" rule as applying to Perzanowski, and because it is undisputed that Modrowski did in fact help sell DVA-owned homes to his son-in-law without special authorization, we affirm the decision of the Board insofar as it sustained the agency's charge that Perzanowski participated "in relationships ... contrary to the best interests of the agency."

### C. Intentional Concealment of Material Facts

The agency also charged that Modrowski concealed his knowledge concerning Perzanowski's purchases of agency property by failing to report to the agency the sale of the houses to his son-in-law. In support of this charge, the agency points to the documents Modrowski signed concerning these transactions to show his knowing participation in the sale. That he did not report the sale as one to a "VA affiliate" is undisputed.

Modrowski contends, however, that he was unaware that the purchaser of the houses was his son-in-law. He testified before the Board that his relationship with Perzanowski is "poor," and that he did not socialize with him. Moreover, Modrowski testified that he was essentially a "number cruncher" at the DVA, and did not notice Perzanowski's name on various documents.

■ The administrative judge ("AJ") heard extensive testimony as to whether Modrowski knowingly participated in the transactions at issue. We need not restate here the scope of the testimony. We conclude that the evidence presented during the hearing provided the Board with ample support for the determination that Modrowski's defense of ignorance was not credible, and that Modrowski knowingly participated in the sale of the properties to Perzanowski. Certainly, the Board's find-ing was supported by at least substantial evidence. Accordingly, we affirm the part of the decision of the Board sustaining the agency's charge that Modrowski knowingly concealed material facts in connection with his employment.

### D. Refusal to Cooperate in the Investigative Proceedings

The agency's remaining charges allege that Modrowski refused to cooperate in the interrogations conducted on July 31 and August 6, 1997. The DVA contends that Modrowski had received by then its letter conveying the U.S. Attorney's declination, and thus that Modrowski no longer had a legal basis for refusing to answer Rogala's questions or face dismissal for such refusals. Modrowski argues that he was unclear about the scope of any immunity conferred as stated in the letter, and thus that he had a legitimate basis for refusing to answer the questions until he had time to meet with his attorney.

■ The Fifth Amendment privilege against self-incrimination may be asserted in an administrative investigation to protect against any disclosure an individual reasonably believes could be used in his own criminal prosecution or could lead to other evidence that might be so used. *Kastigar v. United States*, 406 U.S. 441, 444–45, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In addition, the threat of removal from one's position constitutes coercion, which renders any statements elicited thereby inadmissible in criminal proceedings against the party so coerced. *Garrity v. New Jersey*, 385 U.S. 493, 497, 500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) ("The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent."). Nevertheless, because an employee receives "use immunity" through the so-called *Garrity* exclusion

rule, he may be removed for failure to cooperate with an agency investigation. *Gardner v. Broderick,* 392 U.S. 273, 276, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968). Invocation of the *Garrity* rule for compelling answers to pertinent questions about the performance of an employee's duties is adequately accomplished when that employee is duly advised of his options to answer under any immunity actually granted or remain silent and face dismissal. *Weston v. Dep't of Hous. & Urban Dev.,* 724 F.2d 943, 948 (Fed.Cir.1983).

Modrowski asserts, in essence, that he never had an opportunity to be "duly advised" of his options to respond to Rogala's questions under the immunity allegedly granted or face dismissal. *Id.* Modrowski points to the sequence of events. He received Rogala's letter on July 30, 1997, and asserts that he had questions regarding the scope of any immunity described in that letter. The next day, July 31, 1997, he met with Rogala, and refused to respond to his questions, testifying during the Board hearing that he had "many questions regarding the immunity issue" because he "had no idea of the scope of said immunity." It is undisputed that Modrowski arranged to meet with his attorney the following week, on August 8, 1997, and that he justified his refusal to answer Rogala's questions at the August 6, 1997 meeting by arguing that he should not have to respond until consultation with his lawyer, only two days later. Accordingly, Modrowski argues that he should not be found to have refused to cooperate in the proceedings on these two dates, but that instead he should have been given sufficient opportunity to meet with an attorney to discuss the letter and its scope of immunity. In effect, he argues that the questioning should have been adjourned to August 9. The Board disagreed, determining that Modrowski had no right to delay the proceedings until he met with his lawyer. *See* slip op. at 25 ("Although the appellant argues that the agency should have given him time to consult with his attorney concerning the scope of his immunity, I find no legal authority that imposes such an obligation on an agency once it has informed an employee he has been granted immunity.").

Modrowski's legal rights in this case were far from clear cut. The June 30, 1997 letter stating that the U.S. Attorney had declined to prosecute Modrowski was written on DVA letterhead and signed by Rogala. Even if such a letter is a suitable means of conveying immunity, it is entirely understandable that Modrowski would suspect the validity and scope of the alleged grant. Furthermore, the letter only references the U.S. Attorney's decision to decline prosecution of Modrowski, without setting forth an express grant of immunity. Also, the only transaction covered in the alleged grant of immunity is the "purchase of two properties by Ronald Perzanowski." There is thus considerable ambiguity in the scope of this alleged immunity. The Board's opinion notes that Modrowski testified that he believed he would be subject to criminal prosecution as a result of the investigation, in particular for vandalism and improper issuance of checks. Watson, the Deciding Official, acknowledged during the hearing that the investigation started out focusing on whether "Modrowski might have been stealing materials from VA houses." Although it is unclear from the record whether the agency was continuing to investigate Modrowski for criminal violations at the time of the July 31 and August 6 interrogations, the agency never issued a formal statement announcing the close of such an investigation. The terse language of the letter suggests to us that Modrowski had a reasonable apprehension that any of his responses to Rogala made under the supposed grant of immunity with respect to the sale of the houses could nevertheless be used against him in any eventual crimi-

nal proceedings concerning theft from, or vandalism to, the houses. *Cf. Kastigar*, 406 U.S. at 449, 92 S.Ct. 1653 ("If, on the other hand, the immunity granted is not as comprehensive as the protection afforded by the [Fifth Amendment] privilege, petitioners were justified in refusing to answer.").

Watson, the Deciding Official in this case, testified similarly at the hearing before the Board that the legal significance of Rogala's letter was unclear. When asked whether Modrowski should have had a sufficient opportunity to talk to his lawyer about the letter, Watson acknowledged that it would be reasonable "to give the guy two days to get legal counsel so he can answer the questions ." He testified:

> Q: Can you see how a reasonable person would question, would want to have legal counsel to tell them whether they actually have immunity or not based on a letter of this type? Do you understand?
>
> A: Yes, I could.
>
> Q. And in this case, if Mr. Modrowski was faced with this letter, if he got this letter on July 31st, could you understand why he would want to obtain legal counsel to give him advise about this?
>
> A: Yes, I can.
>
> Q: And if that were true, would that also affect your decision in this matter, would that perhaps change your mind?
>
> A: It would slow me down a little bit.
>
> Q: And do you think that instead of termination you might either choose an alternative discipline or give the guy the chance, give the guy two days to get legal counsel so he can answer the questions, and let him keep his job?
>
> A: Probably.

Modrowski did, indeed, attempt to meet with his lawyer to ascertain his rights. He did so in a timely fashion, scheduling an appointment with his attorney for the week following his receipt of Rogala's letter. No evidence of record suggests that such a delay was unreasonable. Nonetheless, the agency refused to allow Modrowski the time to meet with his attorney, without explanation, then or now, as to why this request could not be accommodated. We find this to be an arbitrary and capricious decision that unfairly denied Modrowski the opportunity to consult with his attorney. We need not reach the question as to whether Modrowski had an absolute right to counsel, as provided by the Fifth or Sixth Amendments or the Administrative Procedure Act, 5 U.S.C. § 555(b) (1994). Nor do we hold that all federal employees who are called to respond to questions in an agency investigation have the right to delay proceedings to obtain legal counsel. In the limited circumstances of the present case, however, we conclude it was arbitrary and capricious to charge Modrowski with a refusal to cooperate. The dispositive factors here are: (1) the agency was admittedly investigating Modrowski for criminal violations; (2) the purported grant of immunity had ambiguous scope; (3) statements elicited under the alleged grant of immunity could conceivably be used against Modrowski in related criminal proceedings; (4) there was no formal assurance from the agency that the criminal investigation had terminated; (5) Modrowski was faced with the penalty of removal for failure to cooperate; (6) Modrowski timely arranged to meet with an attorney; and (7) there is no allegation that Modrowski's request was unreasonable.

The present appeal is thus distinct from *Weston*, where we affirmed the Board's decision sustaining the removal of a federal employee who refused to cooperate in an investigation. *Weston*, 724 F.2d at 943. In *Weston*, there was no allegation that the scope of protection conferred by the

U.S. Attorney's declination to prosecute was ambiguous, and the employee had full access to counsel. *Id.* at 946. The issue in *Weston,* not present in the instant appeal, was whether the employee's penalty for non-cooperation could be mitigated in light of her good-faith reliance on incorrect advice supplied by her lawyer. *Id.* at 950–51. As distinct from *Weston,* Modrowski was denied an adequate opportunity to consult with his lawyer.

Accordingly, we reverse the part of the Board's decision sustaining the charges concerning Modrowski's alleged refusal to cooperate during the July 31 and August 6, 1997 proceedings, *i.e.,* before his meeting with his attorney.

## E. Reasonableness of the Penalty

■ Having sustained all the charges, the Board determined that the agency's penalty of removal is "within the tolerable bounds of reasonableness." Because we are reversing as to the charges concerning Modrowski's refusal to cooperate, the appropriateness and reasonableness of the penalty must be reconsidered by the respective authorities, the agency as to the former, and the Board as to the latter. We note that the testimony before the Board suggests that perhaps the two charges relating to the sale of the houses to Perzanowski might not be seen by the Deciding Official as sufficiently serious to warrant removal. Therefore, we vacate the part of the Board's decision affirming the agency's penalty of removal, with instructions for the AJ to remand the case to the agency to re-determine an appropriate penalty in light of our decision. *See Lachance v. Devall,* 178 F.3d 1246, 1259 (Fed. Cir.1999) ("[T]he Board may not independently determine penalties."). On remand, the agency may choose to propose further charges against Modrowski if it is found that he persisted in refusing to cooperate with the agency's investigation in the period after August 6, 1997.

## Conclusion

We conclude that the agency correctly interpreted its 1988 "VA affiliates" rule to prohibit unauthorized sales of DVA-owned property to in-laws of DVA employees, and accordingly we affirm the Board's decision to the extent that it sustained the charge that Modrowski participated "in relationships ... contrary to the best interests of the agency." And because we determine that substantial evidence supports the Board's finding that Modrowski knowingly participated in the properties to Perzanowski, we affirm the part of the decision sustaining the charge that Modrowski knowingly concealed material facts in connection with his employment. However, we determine that the Board erred as a matter of law by ruling that Modrowski was not entitled to confer with his lawyer about the scope of the immunity letter before having to choose whether to respond to Rogala's questions or face removal for failure to cooperate in an agency investigation. Because the testimony indicates that Modrowski had a legitimate basis for refusing to cooperate with the investigation until he consulted with counsel, and because there is no evidence to suggest that Modrowski unreasonably delayed in meeting with his attorney, we reverse the ruling sustaining the charges of refusal to cooperate. Moreover, we vacate the Board's decision affirming the agency's penalty of removal. We instruct the AJ to remand the case, in turn, to the agency for a re-determination of the appropriate penalty, consistent with this opinion.

*AFFIRMED–IN–PART, REVERSED–IN–PART, VACATED–IN–PART, AND REMANDED*