# United States Court of Appeals

## For the First Circuit

No. 06-1537

ALAM SHER,

Plaintiff, Appellant,

v.

U.S. DEPARTMENT OF VETERANS AFFAIRS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John C. Woodcock, U.S. District Judge]

Before

Lipez, Circuit Judge,
Stahl, Senior Circuit Judge,
and Howard, Circuit Judge.

Tracie L. Adamson, with whom Sumner H. Lipman, Keith R. Varner, and Lipman, Katz & McKee, P.A. were on brief, for appellant.
Halsey B. Frank, Assistant U.S. Attorney, with whom Paula D. Silsby, U.S. Attorney, was on brief, for appellee.

May 29, 2007

**LIPEZ, Circuit Judge.** This case requires us to examine the implications of the immunity that a government employee receives under Garrity v. New Jersey, 385 U.S. 493 (1967), when threatened with an adverse employment action for refusing to answer questions in an administrative investigation by his employer. Statements made in response to such a threat, and the fruits of such statements, may not be used against the employee in subsequent criminal proceedings. That much is clear. The question we consider is whether the circumstances present in this case justified a failure to cooperate charge brought against appellant Dr. Alam Sher by appellee, the Department of Veterans Affairs ("VA"), for Sher's refusal to answer questions as part of an investigation into his conduct by the VA.

Sher was Chief Pharmacist of a hospital operated by the VA in Gardiner, Maine. In 2001, the VA suspended Sher for forty-five days and demoted him from his position with a corresponding reduction in pay grade for obtaining free samples from pharmaceutical companies for personal use, in violation of 5 C.F.R. § 2635, and failing to cooperate with an administrative investigation, in violation of 38 C.F.R. § 0.735-12(b). After an initial reversal of the failure to cooperate charge by an Administrative Law Judge ("ALJ"), the Merit Systems Protection Board ("MSPB") issued a final order upholding the VA's decision. Sher subsequently filed suit in federal district court challenging

-2-

the MSPB decision to sustain the failure to cooperate charge and the penalty imposed by the VA. He also brought a claim of employment discrimination on the basis of religion and national origin against the VA under Title VII, 42 U.S.C. § 2000e-2. Additionally, he moved to amend the record to include a VA training videotape that discusses the practice of obtaining free drug samples. The district court denied the motion to amend the record, upheld the MSPB's decision, and granted summary judgment to the VA on the employment discrimination claim. We affirm the judgment of the district court.

I.

**A.        Factual Background**

We draw the following facts from the administrative record and the parties' affidavits. We note factual disputes where they exist but find that these disputes do not affect our disposition of the case.

Sher is a Muslim of Pakistani origin. He worked as Chief Pharmacist for the Togus Medical Center, located in Gardiner, Maine and operated by the VA, from 1992 until 2001. He received high evaluations during his tenure as Chief Pharmacist. It is uncontested that Togus Director John Sims knew of Sher's Pakistani origin, but the parties disagree as to whether Sims and Togus Chief of Staff Timothy Richardson knew of Sher's Muslim faith.

Federal regulations prohibit federal employees from accepting items of monetary value from anyone doing business with the employee's agency, subject to limited exceptions. See 5 C.F.R. §§ 2635.201-.203. The VA also promulgates its own agency-specific regulations, and individual units of the VA develop their own local policies. In August 1999, Togus instituted a facility-wide policy prohibiting "sampling," a practice in which representatives of pharmaceutical companies give providers free samples of their medicines to facilitate better understanding of the medicines' application and efficacy. Although the parties agree that Sher had notice of this policy, Sher states that he believed that the policy applied only to the distribution of samples to patients or veterans. Many medical professionals at Togus shared his belief.

In August 2000, Sher attended a training on standards of ethical conduct for government employees. At that training, he received a pamphlet entitled "An Ethics Pamphlet for Executive Branch Employees," which explained the federal gift ban with the statement that "[a]n employee shall not, except as permitted by the Standards of Ethical Conduct, solicit or accept any gift or other item of monetary value from any person . . . doing business with . . . the employee's agency." The pamphlet also noted that "you may not accept a gift from people or organizations who are 'prohibited sources'--those who do business with, or seek to do business with your agency." Employees could "accept any gift that is not worth

-4-

more than $20," but could not "ask for [ ] something worth $20 or less."

Throughout the proceedings leading to this litigation, Sher has stipulated that, after experiencing chest pain and consulting a cardiologist, he requested and received free samples of Lipitor several times while employed as Chief Pharmacist at Togus. On or about June 16, 2000, in order to participate in a Parke-Davis promotional program, Sher signed a Free Goods Requisition Form for Lipitor. He signed another such form on August 16, 2000. In December 2000, Sher asked a Pfizer sales representative for samples of Lipitor, and repeated his request after a "lunch and learn" program in mid-January of 2001. On about January 25, Sher asked another Pfizer representative for samples of Lipitor and signed a "starter activity form" in order to receive the Lipitor. Two days later, a Pfizer sales representative provided Sher with thirty-two ten-milligram samples of Lipitor, a fifty-six day supply. On about January 29, another sales representative provided Sher with more samples of Lipitor.

On January 29, 2001, a Togus employee informed Chief of Human Resources James Schillinger and VA counsel Carole Moore that Sher had accepted drugs from a pharmaceutical representative. That same day, at the request of Schillinger and Moore, Togus security officers stopped Sher as he was leaving the medical center. The

-5-

officers searched Sher's briefcase and office, finding 672 ten-milligram samples of Lipitor.

The VA initiated an investigation of Sher's activities related to sampling.  Under 38 C.F.R. § 0.735-12(b), federal employees must furnish information with respect to employment and disciplinary matters unless to do so would be self-incriminating. On February 1, VA Investigator Timothy Bond interviewed Sher, who admitted receiving free samples of Lipitor from Pfizer sales representatives.  Having retained attorney Sumner Lipman to represent him, Sher attempted, unsuccessfully, to contact Lipman by phone during the interview.  The parties dispute the events that took place at this interview.  Sher asserts that, although he agreed to participate in the interview, he did so only because Bond gave him no choice.  For its part, the VA contends that Bond informed Sher of his rights under Garrity, 385 U.S. 493,[1] at the meeting, and that Sher subsequently consented to the interview.

Bond presented the case against Sher to the United States Attorney's Office for the District of Maine for consideration for criminal prosecution.  On March 7, the U.S. Attorney's Office verbally declined prosecution.

On June 5, Bond again attempted to interview Sher without Lipman present.  The parties agree that Sher unsuccessfully tried

---

[1] We will discuss Garrity and its progeny in section IV.B, infra.

-6-

to reach Lipman by phone during the interview, but the record offers no other information about the events that took place at this interview.

In a letter dated June 28, 2001, Togus Chief of Staff Timothy Richardson notified Sher that an administrative interview had been scheduled for July 10. The letter informed Sher that "the United States Attorney of the District of Maine has declined criminal prosecution in the matter before the Inspector General," that "the matter is therefore an administrative investigation," that he was "entitled to the representative of his choice," that federal regulations require employees to "furnish information . . . in cases respecting employment and disciplinary matters," and that "[r]efusal . . . may be ground for disciplinary action."

By letter dated July 2, Sher asked to reschedule the interview because he had planned to be on vacation until July 11 and his attorney, Sumner Lipman, was unavailable until July 15. Acting on behalf of Togus Director John Sims, Schillinger rescheduled the interview for July 11, thereby effectively refusing Sher's request to have his preferred representative present. The letter rescheduling the interview, dated July 2, reiterated that the U.S. Attorney's Office had declined criminal prosecution, that the issue was now an administrative matter, that Sher was obliged by regulation to provide information, and that he could be disciplined if he refused.

On July 11, Sher appeared with attorney Keith Varner, a partner of Lipman, for the interview with Investigator Bond. VA Counsel Moore also attended the meeting. Varner requested that they postpone the interview until July 13 to allow Lipman to attend.[2] Moore refused the request. Varner also expressed his concern that the interview would expose Sher to criminal liability. In an attempt to address this concern, Moore obtained, by fax, a letter from the U.S. Attorney's Office for the District of Maine declining prosecution. The letter from First Assistant United States Attorney William H. Browder stated, in its entirety:

> On March 7, 2001, this office declined criminal prosecution of Mr. Sher in favor of administrative action. The conduct for which Mr. Sher was being considered for prosecution was his request and receipt of drug samples (specifically Lipitor) in August of 2000 and January and February of 2001.

After reviewing this fax, Varner consulted with Lipman by phone. Lipman was concerned that the letter still left Sher at risk of criminal prosecution, and Sher ultimately declined to be interviewed.

As the result of its investigation, the VA subsequently sustained administrative charges against Sher for soliciting Lipitor on five occasions between June 2000 and January 2001 and for receiving and possessing 672 individual samples of Lipitor on

---

[2] Although Lipman originally planned to be out of town until July 15, he later offered to cut short his vacation to attend a July 13 interview.

January 29, 2001, all in violation of 5 C.F.R. § 2635. The VA also sustained a charge of failure to cooperate with an administrative investigation, in violation of 38 U.S.C. § 0.735-12. As punishment for these violations, Sims imposed a forty-five day suspension and demoted Sher from his position as Chief Pharmacist, with a corresponding reduction in pay grade from GS-13 to GS-12.

## B. Administrative Proceedings

Sher appealed the VA's decision to the MSPB and raised the affirmative defense of discrimination based on national origin and religion. As part of the MSPB review process, an ALJ initially heard Sher's case and sustained the charges relating to Sher's sampling of pharmaceuticals, but overruled the failure to cooperate charges on the ground that the concerns of Sher and his counsel regarding possible prosecution were legitimate. The ALJ also rejected Sher's affirmative defenses of national origin and religious discrimination. Finally, the ALJ held that the agency's penalty was unreasonable given the factors identified in Douglas v. Veterans Administration, 5 M.S.P.R. 280 (1981).[3]

---

[3] The Douglas factors include: "(1) the nature and seriousness of the offense . . . ; (2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; (3) the employee's past disciplinary record;(4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability; (5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties; (6) consistency of the penalty with those imposed upon other employees for the same or similar

The parties cross-appealed the ALJ's decision. An MSPB panel sustained the ALJ decision on the sampling charges and Sher's defense of discrimination, but overruled the ALJ's decision on the failure to cooperate charge and the penalty imposed. The MSPB panel indicated that the letter from the U.S. Attorney's office "was sufficient to provide the appellant with 'use' immunity from prosecution" and found it significant that the letter came directly from the U.S. Attorney's Office. The MSPB panel also considered it significant that Sher retained Lipman in February 2001, that Sher was represented by Varner in person, and that Lipman was accessible by phone during the July 11 interview.

## C.        District Court

On October 19, 2004, Sher filed suit in federal court challenging the MSPB decision on both the failure to cooperate

---

offenses; (7) consistency of the penalty with any applicable agency table of penalties; (8) the notoriety of the offense or its impact upon the reputation of the agency; (9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question; (10) potential for the employee's rehabilitation; (11) mitigating circumstances surrounding the offense . . . ; (12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others." 5 M.S.P.R. at 325-26. After discussing these factors, the ALJ summarized his reasons for finding the VA's penalty unreasonable: "I find that the appellant's offenses were not intentional but were technical, that he never knew that requesting/receiving the Lipitor samples was wrong, and that his offenses were not serious due to the non-gift-like qualities of drug samples received from pharmaceutical representatives." The ALJ also noted that Sher "has no past disciplinary record and excellent long-term prior performance and job dedication."

charge and the reasonableness of the penalty. He also alleged that the VA discriminated against him based on national origin and religion in violation of Title VII. Sher subsequently filed a motion to amend the administrative record to include a training videotape that discussed sampling.

The district court denied the motion to amend the record on the ground that Sher had not made the required showing of bad faith or improper behavior. The court then affirmed the MSPB decision in all respects, adopting, in large measure, a Recommended Decision by the magistrate judge. The court found no abuse of discretion in the VA's decision to discipline Sher for his refusal to participate in the interview because Sher received multiple assurances that he would not be prosecuted and was represented by Varner in person and Lipman by phone. The court also granted summary judgment to the VA on the Title VII claim on the ground that Sher failed to demonstrate that the VA's stated reasons for disciplining him were pretext for discrimination. The district court affirmed the penalty imposed by the VA without explicitly discussing it.

On appeal, Sher challenges the court's ruling on the videotape, the affirmance of the MSPB decision on the failure to cooperate charge and penalty, and the rejection of his Title VII claim.

**II.**

Sher claims that the district court erred in refusing to amend the administrative record to include a VA videotape entitled "Employee Integrity and Pharmacy Security." We review this claim at the outset because our resolution of the issue determines the content of the administrative record that we review in evaluating Sher's other claims.

The videotape came to Sher's attention in March 2005 when it was played at a monthly staff meeting of the Togus Pharmacy Service; it apparently had been used for ethical training as early as 1994. The video depicts with approval a chief of pharmacy encouraging a doctor to call a drug manufacturer to obtain free samples of medications.

In our review of an administrative decision, "the focal point . . . should be the administrative record already in existence, not some new record made initially in the reviewing court." Camp v. Pitts, 411 U.S. 138, 142 (1973). The reviewing court "'may' (although it is not required to) supplement the record where there is [] 'a strong showing of bad faith or improper behavior' by agency decision makers." Olsen v. United States, 414 F.3d 144, 155 (1st Cir. 2005) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971), overruled on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)). Thus, the question of whether there is bad faith or improper behavior is a factual question, on which we review the district court's

determination for clear error, Charles v. Rice, 28 F.3d 1312, 1317 (1st Cir. 1994).  If the district court has properly found such behavior, Olsen's statement that the district court may, but is not required to, open the record indicates that we should review its decision for abuse of discretion.

Here, the district court denied Sher's motion to amend the record on the ground that he had presented no evidence of bad faith or improper behavior.[4]  It held that the videotape was cumulative of other evidence demonstrating that the practice of sampling was commonplace at the VA.  It also emphasized that the videotape's implied approval of sampling cannot supersede the federal regulatory prohibition on such activity.

On appeal, Sher contends that the court erred in finding no bad faith in the VA's failure to turn over the videotape in response to an Acknowledgment Order from the ALJ seeking "all other

_____

[4]After the magistrate judge recommended denial of Sher's motion to amend the record, Sher petitioned the MSPB to reopen the administrative record to allow the videotape.  The MSPB declined to hear the petition, stating that the Board's regulations do not provide for requests for reconsideration of its final decision. Sher then filed a "Motion to Reconsider Motion to Amend the Record and for Relief," as well as an objection to the Recommended Decision of the magistrate judge.  He argued that, because the MSPB declined jurisdiction, the district court assumed exclusive jurisdiction to amend the record.  In its review, the district court alternately considered Sher's motion as: (1) a motion for judicial review of a MSPB denial of a motion for reconsideration; (2) a motion for judicial review of a MSPB refusal to reopen the record; (3) a motion for the district court to reopen the record. The court found that, however the issue is conceived, Sher failed to demonstrate that the record should be reopened.  On appeal, Sher pursues only the third alternative, requesting that we reverse the district court's decision and grant his motion to amend the record.

documents which are relevant and material to this appeal." He also renews his argument that the videotape establishes VA approval of sampling. The VA counters that there is no evidence that the VA withheld the videotape in bad faith, the tape is not an authoritative statement of VA policy, and the tape duplicates other evidence in the record.

We find no clear error in the district court's conclusion that there was no bad faith. Sher offers no further evidence that the tape was withheld intentionally or for any improper reason. Indeed, the videotape came to light when Sher's successor played it for training purposes, undermining any suggestion that his superiors sought to conceal the tape.

Moreover, the videotape would have had little probative value if admitted. Sher already had introduced testimony from his coworkers to demonstrate the unofficial understanding that sampling was allowed. While the videotape might have suggested that the VA — at some time — had endorsed that understanding, the tape could not, as the district court recognized, preempt the regulation's ban on sampling. Thus, the district court did not err in denying Sher's motion to amend the record.

**III.**

Determining the framework applicable to our review of Sher's challenge to the failure to cooperate charge, including his affirmative defense of discrimination, is a matter of some complexity. For the sake of clarity, we will first describe the

-14-

district court's review of the MSPB decision. The Administrative Procedure Act ("APA") explicitly provides that a claim of discrimination on the basis of race, color, religion, sex, or national origin is an affirmative defense to any adverse personnel action taken by an agency. See 5 U.S.C. §§ 2302(b), 7701(c)(2). Although a petition to review a final order of the MSPB usually is filed in the Federal Circuit, see 5 U.S.C. § 7703(b)(1), that procedure changes when an employee raises a discrimination claim before the MSPB - even as an affirmative defense. The APA provides that discrimination claims shall be filed under Title VII, see 5 U.S.C. § 7703(b)(2), and an affirmative defense of discrimination raised under § 7701(c)(2) therefore is properly appealed to the district court as a Title VII claim. See 29 C.F.R. § 1614.310(b); Kelliher v. Veneman, 313 F.3d 1270, 1274 (11th Cir. 2002). In "mixed" cases where discrimination claims as well as claims not based on discrimination were presented before the MSPB, the district court has jurisdiction to review both types of claims. Kelliher, 313 F.3d at 1274.

The discrimination and non-discrimination claims are subject to distinct standards of review. For the discrimination claim, "the facts [are] subject to trial de novo by the reviewing court." 5 U.S.C. § 7703(c). The non-discrimination claims, however, remain subject to the usual standard of review for administrative decisions, and are set aside if the MSPB decision was "(1) arbitrary, capricious, an abuse of discretion or otherwise

-15-

not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). Thus, "where the MSPB decides a case combining both discrimination and non-discrimination claims, the district court takes jurisdiction over appeals from both determinations, but reviews the non-discrimination claims on the [administrative] record." Barnes v. Small, 840 F.2d 972, 979 (D.C. Cir. 1988); see also Williams v. Dep't of Army, 715 F.2d 1485, 1491 (Fed. Cir. 1983)(en banc).

Here, the district court reviewed Sher's claims using this framework and granted summary judgment for the VA on all claims. Although we now review the district court's decision to grant summary judgment de novo, we apply that standard in a differentiated fashion. With respect to the non-discrimination claims, we review the administrative record directly, applying the same standard of review to that record that the district court applied. See Crawford v. Runyon, 37 F.3d 1338, 1340 (8th Cir. 1994). With respect to the discrimination claim, we review the decision of the district court directly. See id. With this framework in mind, we turn first to Sher's challenge to the failure to cooperate charge.

## IV.

As the result of his refusal to answer questions on July 11, 2001, the VA charged Sher with failure to cooperate with its

-16-

investigation into his alleged improper sampling in violation of 38 C.F.R. § 0.735-12(b).[5] The VA contends that Sher had no legal basis for his refusal to cooperate. It notes that Sher was represented by Varner at the interview and had access to his first choice counsel, Lipman, by phone. The VA also emphasizes that it informed Sher and his attorneys orally and in writing that criminal prosecution had been declined and that the investigation was purely administrative. Sher argues that he had legitimate reasons for refusing to answer questions because the letter stated only that the U.S. Attorney had declined to prosecute as of a certain date, not that it conferred immunity; the dates in the letter did not match the dates that he sought Lipitor; and the VA did not reschedule the interview so that Lipman could be present. The question before us, therefore, is whether the MSPB was arbitrary and capricious in upholding the failure to cooperate charge on the ground that Sher had no legal basis for refusing to answer the questions posed to him.

---

[5] 38 C.F.R. § 0.735-12(b) states: "Employees will furnish information and testify freely and honestly in cases respecting employment and disciplinary matters. Refusal to testify, concealment of material facts, or willfully inaccurate testimony in connection with an investigation or hearing may be ground for disciplinary action. An employee, however, will not be required to give testimony against himself or herself in any matter in which there is indication that he or she may be or is involved in a violation of law wherein there is a possibility of self-incrimination."

## A.    Effect of Successive Decisions

In addition to the arbitrary and capricious review we ordinarily apply to decisions of the MSPB, we have in this instance another layer of review to consider due to the differences between the MSPB decision and the ALJ decision that preceded it.[6]  Under the APA and its regulations, the MSPB generally "is free to substitute its judgment" for that of the ALJ.  Connolly v. U.S. Dep't of Justice, 766 F.2d 507, 512 (1985).  However, the MSPB must give deference to the ALJ on any issues of credibility, see id., and is "not free to overturn an [ALJ's] demeanor-based credibility findings merely because it disagrees with those findings,"  Haebe v. Dep't of Justice, 288 F.3d 1288, 1299 (Fed. Cir. 2002).

Here, the ALJ overruled the agency's finding that Sher failed to cooperate with the investigation into his sampling.  The MSPB then reversed the ALJ's decision.  If the ALJ's decision rested on credibility determinations, we would need to consider whether the MSPB gave it due deference.

Such review is unnecessary, however, because any credibility determinations by the ALJ were not dispositive of the failure to cooperate charge.  The ALJ acknowledged that "[a]lthough

---

[6] The MSPB has the authority to refer cases to an ALJ.  See 5 U.S.C. § 7701(b).  However, the ALJ's decision is merely "an initial decision," 5 C.F.R. § 1201.111, which becomes final unless it is reopened or reconsidered on motion of the parties or by motion of the board itself, see id. § 1201.113.  Where a case is reviewed or reopened, the MSPB may "affirm, reverse, remand, modify, or vacate the decision of the judge, in whole or in part." Id. § 1201.117(b).

-18-

there are slight differences in [the accounts provided by Moore, Bond, and Varner], essentially what happened is not in dispute." Moreover, as we will discuss in more detail below, the failure to cooperate charge raises the legal question of whether Sher had adequate notice of his immunity under Garrity, see infra Section IV.C. The subjective mental states of Sher and his attorneys are irrelevant to that legal question.[7]

Thus, we need not consider whether the MSPB gave due deference to the ALJ's credibility determinations as we apply arbitrary and capricious review to the MSPB decision on the failure to cooperate charge. In applying this review, the question is not how this court would rule de novo, but rather whether the administrative determination is supported by substantial evidence in the record as a whole. Hayes v. Dep't of the Navy, 727 F.2d 1535, 1537 (Fed. Cir. 1984).

B.          **Immunity Under Garrity**

In Garrity v. New Jersey, 385 U.S. 493, 499 (1967), the Supreme Court considered whether the government "can use the threat of discharge to secure incriminatory evidence against an employee." Garrity involved an investigation by the Attorney General of New

---

[7] Thus, we owe no deference to the ALJ's statements that "legitimate concerns surfaced, dominating the appellant's view of the situation and causing him to refuse to answer Bond's questions" and that "Lipman, credibly, had a real concern about" the scope of the grant of immunity. Although such statements arguably entail credibility determinations by the ALJ, they have no bearing on our disposition of the legal question of whether Sher had notice of his immunity.

Jersey into alleged irregularities in the handling of cases in which the appellant police officers were told that if they did not answer questions, they would be subject to removal from office. Id. at 494.[8]  After the police officers answered the questions, their statements were used in a subsequent prosecution against them.  Id. at 495.  After noting that "[t]he option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent," id. at 497, the Court held unconstitutional the "use in subsequent criminal proceedings of statements obtained under threat of removal from office," id. at 500.

Subsequently, the Court held that Garrity's prohibition on the use of statements made under threat of adverse employment action also means that if an employee

> refuse[s] to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, the privilege against self-incrimination would not [be] a bar to his dismissal.

Gardner v. Broderick, 392 U.S. 273, 278 (1968)(internal footnote and citation omitted).  Thus, together, Garrity and Gardner stand

---

[8] Although Garrity involved an investigation by a state attorney general, the constitutional prohibition on compulsory self-incrimination also applies to statements made in an administrative investigation. See Kastigar v. United States, 406 U.S. 441, 444-45 (1972).

for the proposition that a government employee who has been threatened with an adverse employment action by her employer for failure to answer questions put to her by her employer receives immunity from the use of her statements or their fruits in subsequent criminal proceedings, and, consequently, may be subject to such an adverse employment action for remaining silent.[9] Importantly, the employee is not guaranteed transactional immunity. Rather, "the United States is prohibited from using the testimony or its fruits, and . . . this degree of prohibition is enough." Uniformed Sanitation Men v. Comm'r of Sanitation, 426 F.2d 619, 624 n.2 (2d Cir. 1970).[10]

When an employee is confronted with the threat of an adverse employment action for refusal to answer questions, "the very act of . . . telling the witness that he would be subject to removal if he refused to answer was held to have conferred such

_____

[9] Some courts have referred to this proposition as the "Garrity rule." See, e.g., Weston v. Dep't of Hous. & Urban Dev., 724 F.2d 943, 948 (Fed. Cir. 1983).

[10] The Supreme Court has distinguished transactional immunity, which "accords full immunity from prosecution for the offense to which the compelled testimony relates," from use immunity, which protects the witness from "the use of compelled testimony, as well as evidence derived directly and indirectly therefrom." Kastigar, 406 U.S. at 453. In Kastigar, the Court emphasized that "immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." Id. By contrast, transactional immunity "affords the witness considerably broader protection than does the Fifth Amendment privilege." Id. Thus, the Constitution mandates use immunity where testimony is compelled, but transactional immunity is a matter of prosecutorial discretion. See id. at 459.

-21-

immunity." Uniformed Sanitation Men, 426 F.2d at 626.[11] Under these circumstances, no specific grant of immunity is necessary: "It is the very fact that the testimony was compelled which prevents its use in subsequent proceedings, not any affirmative tender of immunity." Gulden v. McCorkle, 680 F.2d 1070, 1075 (5th Cir. 1982); see also United States v. Veal, 153 F.3d 1233, 1239 n.4 (11th Cir. 1998)("The Fifth Amendment protection afforded by Garrity to an accused who reasonably believes that he may lose his job if he does not answer investigation questions is Supreme Court-created and self-executing; it arises by operation of law; no authority or statute needs to grant it.").[12]

Here, the letters that Sher received from the VA on June 28 and July 2 quoted regulations stating that "[e]mployees will furnish information and testify freely and honestly in cases respecting employment and disciplinary matters. Refusal to testify

---

[11] Although Garrity itself dealt with a situation in which employees were threatened with removal, any situation in which the employee is subject to an adverse employment action is sufficient to trigger Garrity immunity. See, e.g., Uniformed Sanitation Men, 426 F.2d 619, 621 (applying Garrity in a situation where employees were told generally that they would be "subject to disciplinary action" for failure to answer questions).

[12] True, we have previously noted that "[a] state may compel incriminating answers to its questions . . . if the testimony and its fruits are rendered unavailable for use in subsequent criminal proceedings, i.e. through a grant of immunity." United States v. Stein, 233 F.3d 6, 15 n.4 (1st Cir. 2000)(emphasis added). However, in light of the considerable amount of persuasive authority from other circuits on this issue, we think it clear that Stein should be read to mean that testimony compelled by the threat of adverse employment action automatically triggers a grant of immunity under Garrity.

-22-

. . . in connection with an investigation or hearing may be ground for disciplinary action." This notification was a threat of removal sufficient to constitute coercion under Garrity. Under such conditions, Sher's statements and their fruits would be inadmissible in subsequent criminal prosecutions regardless of the subsequent letter faxed from the U.S. Attorney's Office stating that the office had declined prosecution.

We emphasize this point to clarify an apparent misconception by both the MSPB and Sher. In its decision, the MSPB stated that "we find that the letter from the U.S. Attorney was sufficient to provide the appellant with 'use' immunity from prosecution under the Garrity rule." Similarly, Sher's brief refers to the letter's "failure to confer immunity." These statements incorrectly suggest that the letter from the U.S. Attorney's Office was the source of any immunity. As a matter of law, the immunity attached automatically when Sher faced the loss of his job for refusal to testify, and the letter served at most to notify Sher of the existing immunity.

Sher thus had no basis under the Fifth Amendment for refusing to answer the VA's questions. However, in assessing the propriety of the failure to cooperate charge, we still must consider whether Sher received adequate notice from his employer of his immunity under Garrity to justify the failure to cooperate charge.

**C.          Notice of Garrity Immunity**

The question of whether an employee has adequate notice of his immunity under Garrity to justify a failure to cooperate charge arises because the consequences of Garrity immunity are not self-evident.  As the Seventh Circuit has observed:

> Uncounselled persons are much more likely to know about their "Fifth Amendment" right than they are to know about an immunity that qualifies the right.  Asked to give answers to questions put to them in the course of an investigation of their arguably criminal conduct, they may instinctively "take the Fifth" and by doing so unknowingly set themselves up to be fired without recourse.

Atwell v. Lisle Park Dist., 286 F.3d 987, 990 (7th Cir. 2002). Thus, to provide adequate notice of immunity under Garrity, a government employer might have to explain two concepts.  First, the employer might have to explain that the threat of an adverse employment action for a failure to answer questions means, as a matter of Fifth Amendment law, that the employee's statements and their fruits may not be used in subsequent criminal proceedings. We refer to this concept as the "application of Garrity immunity." Second, the employer might have to explain that the employee, now afforded the self-incrimination protection of the Fifth Amendment by operation of law, may be subject to adverse employment action for remaining silent.   We refer to this concept as the "consequences of Garrity immunity."

The circuits have taken different approaches to the issue of whether a government employer is required to provide such notice

-24-

to an employee.  The Seventh Circuit has indicated that a government employer has an affirmative duty to apprise an employee of both the application and consequences of Garrity immunity:

> Our court has ruled in several cases that the government employer who wants to ask an employee potentially incriminating questions must first warn him that because of the immunity to which the cases entitle him, he may not refuse to answer the questions on the ground that the answers may incriminate him.

Atwell, 286 F.3d at 990.  Similarly, the Federal Circuit has held that "[i]nvocation of the Garrity rule for compelling answers to pertinent questions about the performance of an employee's duties is adequately accomplished when that employee is duly advised of his options to answer under the immunity granted or remain silent and face dismissal."  Weston, 724 F.2d at 948 (emphasis added).

Other circuits have been less directive.  In Gulden, the Fifth Circuit found that a municipality did not have to make "an affirmative tender of immunity . . . prior to an employee's appearance at a polygraph exam."  680 F.2d at 1075.  Although the court referred to a tender of immunity, the context of this phrase indicates that the court actually meant that the employer need not advise the employee of the immunity conferred by Garrity.[13]  However, because the employees did not actually show up for their

---

[13] In discussing whether an "affirmative tender of immunity" is constitutionally required, the court referred to several cases in which the Seventh Circuit held that the employer must advise the employee of the application and consequences of his immunity under Garrity.  See Gulden, 680 F.2d at 1074-75 (collecting cases).

-25-

interview, the court held that "the inquiry had not advanced to a level of specificity in which the competing concerns of immunity could be properly addressed," and, consequently, that "no affirmative duty (if any such duty may ever be found) had devolved upon the employer to advise [the employees] that immunity was available." Id. at 1076.

Similarly, in Hester v. City of Milledgeville, the Eleventh Circuit indicated by omission that it recognized no duty of the employer to advise the employee of the application and consequences of Garrity immunity. It stated: "We fail, however, to see how the city's failure to offer the plaintiffs use immunity could make any constitutional difference. . . . Such a guarantee would serve no useful purpose." 777 F.2d 1492, 1496 (11th Cir. 1985). The court then explained that "any grant of use immunity to the plaintiffs would have been duplicative." Id. (citing Gulden, 680 F.2d at 1073-76). The court's statement that offering immunity would serve no purpose and its silence as to any duty of the employer to provide notice indicate a view that the employer has no such duty.

This disagreement among the circuits notwithstanding, no circuit has held that an employee who is represented by counsel is entitled to notice from his employer of his Garrity immunity. In Atwell, the Seventh Circuit considered a situation in which an attorney for a municipality had told an employee under investigation that her attorney would probably instruct her to

remain silent. 286 F.3d at 989. After consulting with her attorney, the employee refused to be interviewed and was terminated for insubordination. Id. While acknowledging its rule that employers must explain to employees the nature of their immunity under Garrity, the court suggested that the justification for such a duty is most compelling for unrepresented employees. Id. at 990. The court specifically left open the question of "whether, in light of its rationale, [the Seventh Circuit's rule that an employer has a duty to warn an employee of his immunity under Garrity] has any possible application when the employee has a lawyer" and emphasized that the employee "was not being asked to meet with the investigator in the absence of her lawyer." Id. at 991. However, the court ultimately concluded that, because the employee did not actually attend the interview, the municipality had not violated her rights by failing to warn her about her immunity. Id.

The Federal Circuit also has deemed representation by a lawyer significant. In Modrowski v. Department of Veterans Affairs, 252 F.3d 1344, 1347 (Fed. Cir. 2001), the VA had investigated an employee for violating rules prohibiting the unauthorized sale of VA-owned property to close family members. The employee received a letter on VA letterhead stating:

> 1. The U.S. Attorney has been apprised of the situation, granted you immunity and has declined to prosecute you in the matter of the purchase of two properties by Ronald Perzanowski. 2. You are hereby notified your assertion of your Fifth Amendment rights is unnecessary since you will not be prosecuted.

3. You are therefore ordered to respond to my questions concerning this matter.

Id. at 1347. After the employee refused to answer questions until he could meet with his attorney, the VA charged him with failure to cooperate in the investigative proceedings, and ultimately he was removed from his position. Id. at 1348. The court concluded that it was arbitrary and capricious to charge an employee for failing to cooperate with an investigation "[i]n the limited circumstances of the present case," noting several "dispositive factors," including the ambiguity of the scope of immunity, the existence of pending criminal proceedings on a different but related matter, and the agency's acknowledgment that it would have been reasonable to allow Modrowski to consult with counsel. Id. at 1352. The court specifically stated that it did not reach the question of "whether Modrowski had an absolute right to counsel" and that it did not "hold that all federal employees who are called to respond to questions in an agency investigation have the right to delay proceedings to obtain legal counsel." Id.[14]

In sum, the circuits have reached different conclusions about the notice, if any, that the government employer must give to

_____

[14] The dissent states that the decision in Modrowski was premised on the fact that "the employee did not have full access to counsel," and further states that "the same condition[] obtained in Sher's case." The same condition does not apply here. In Modrowski, the employee had no opportunity to meet with his attorney prior to questioning, whereas Sher had been represented by Lipman for over five months before the July 11 interview, Varner accompanied Sher to the interview, and Varner was able to speak to Lipman by phone during the interview.

-28-

an unrepresented employee about his Garrity immunity. However, no court has held that the government employer must give notice of Garrity immunity to an employee represented by counsel.

D.        **Sher's Circumstances**

In applying this authority to Sher's circumstances, our inquiry is limited to determining whether the MSPB acted in an arbitrary and capricious manner when it concluded that the VA properly charged Sher with failure to cooperate. In the circumstances of this case, we do not have to decide whether the VA as employer had to give Sher notice of the application and consequences of his Garrity immunity. Regardless of whether there was any duty, Sher may be fairly charged with such notice under the circumstances present here.

Although we agree with Sher that the VA's conduct in refusing to delay the interview so that Lipman could attend was not exemplary, we cannot conclude that Sher was effectively without legal representation. Sher's brief emphasizes that the June 28 and July 2, 2001 letters from the VA stated that Sher was "entitled to a representative of [his] choice." Sher had been represented by Lipman since February 2001 and was accompanied to the interview by Varner, an attorney who had been practicing since 1979 (albeit not in criminal law). Varner consulted with Lipman on the phone during the interview. As the district court noted, it is unclear what more Lipman could have done if he had been present at the interview. Without doubt, Sher's request to delay the interview

-29-

for a few days so that Lipman could attend in person was not unreasonable; the agency had already waited four months to take administrative action.[15] Nonetheless, with Varner present and Lipman available by phone, we conclude that Sher had access to counsel of his choice.[16]

Moreover, the June 28 and July 2, 2001 letters from the VA clearly contained a threat of removal sufficient to provide notice of the application of immunity under Garrity. Subsequently, a July 25 letter from Lipman to Carol Moore, counsel for the VA - written after the July 11 interview but well before charges were filed against Sher on August 31 - indicated that Lipman had a conversation with Moore in which she referred him to Weston, 724 F.2d 943, and Hanna v. Department of Labor, 18 Fed. Appx. 787 (Fed. Cir. 2001). As we explained in Section IV.C, supra, Weston held that an employee was duly advised of her immunity under Garrity when she and her counsel were read a statement that the U.S. Attorney's office had declined prosecution, that her failure to answer questions could subject her to removal, and her statements and their fruits would not be used criminally. 724 F.2d at 948. Hanna explained that, "[a]s a consequence of the directive

_____

[15] The U.S. Attorney's Office declined prosecution on March 7, 2001, and the interview did not take place until July 11, 2001.

[16] We take no position on whether there is a right to counsel under these circumstances. However, the involvement of counsel is highly relevant to our evaluation of whether Sher had notice of the application and consequences of immunity under Garrity and could be fairly charged with a failure to cooperate.

compelling [the employee] to respond to questions at the interview under threat of removal, [the employee] was automatically entitled to use immunity for any statements made at the interview" and thus had no basis for refusing to answer questions. 18 Fed. Appx. at 791.

If Sher had not been represented by counsel, these communications from the VA may or may not have provided Sher with adequate notice to justify a failure to cooperate charge. We do not have to decide that issue here because of the involvement of counsel. Since Sher received the June 28 letter more than two weeks before the scheduled interview on July 11, his attorneys had sufficient time to explain to Sher that the automatic conferral of Garrity immunity meant that he could answer the VA's questions without fear that his answers could be used against him in a criminal prosecution.[17] Although Moore apparently had not referred Lipman to Weston and Hanna by the time of the July 11 interview, there was ample opportunity after she did so for his attorneys to advise Sher of consequences of his immunity and schedule another interview at which he could respond to questions prior to the filing of charges on August 31.

---

[17] Although a letter from the U.S. Attorney's Office declining prosecution was unnecessary to confer Garrity immunity, which flowed from the threat of removal itself, the VA also attempted to reassure Sher and his attorneys at the July 11 interview by obtaining a letter directly from the U.S. Attorney's Office.

Under such circumstances, we hold that Sher may be fairly charged with adequate notice of his immunity under Garrity.[18]  Thus, the MSPB was not arbitrary and capricious in sustaining the failure to cooperate charge.

**V.**

We review de novo the district court's grant of summary judgment with respect to Sher's claims of national origin and religious discrimination.  See 42 U.S.C. § 2000e-2; 5 U.S.C. § 7703(c).  We will affirm the order if "there is no genuine issue as

---

[18] The dissent attributes to the majority a rule that is nowhere to be found in the majority decision:
> [O]nce the employer requires a represented employee to answer questions under the threat of discharge, the employee automatically gets the benefit of use immunity . . . and also is automatically obliged to answer questions or face discipline . . . .  This is true . . . even where, as here, the employee declines to answer his employer's questions because he has an objectively reasonable fear that his statements will not in fact be protected by use immunity.

If we had concluded that a represented employee with the benefit of use immunity was automatically obliged to answer questions or face discipline, we would not have engaged in the detailed analysis of "Sher's Circumstances" in Part IV.D.  Similarly, if we had concluded there was such an obligation even where the employee has an objectively reasonable fear that his statements will not be protected by use immunity, we would not have emphasized that Sher's attorneys had sufficient time to explain the application and consequences of Garrity immunity to him so that Sher could be fairly charged with notice of that immunity.  Rather than adopting any broad rule, we have analyzed what the dissent terms the "discipline issue" by focusing on the case-specific facts which include, importantly, Sher's representation by counsel in his dealing with the VA.  The dissent minimizes the importance of Sher's representation by counsel, and proposes a broad rule imposing a duty upon the government employer to warn the employee about the application and consequences of Garrity immunity, even in cases where the employee is represented by counsel.  There is no case law supporting such a rule.

to any material fact and [the VA] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Sher has presented his discrimination claim within the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[19] The parties agree that Sher has made out a prima facie case of discrimination under McDonnell Douglas. As its legitimate, nondiscriminatory reason for taking adverse employment action, the VA asserts that Sher violated ethical rules governing employees, specifically: (1) his failure to cooperate with the investigation, and (2) his stipulations that he engaged in sampling and was discovered with 672 individual samples of Lipitor. Consequently, the burden of production shifts back to Sher to present evidence that these stated reasons are pretext for discrimination. We emphasize, however, that the burden of persuasion remains with Sher at all times.

---

[19] Under this analysis, the plaintiff must first establish a prima facie case of discrimination, which is accomplished when plaintiff shows that: "(1) he is a member of a protected class; (2) he was qualified for the job; (3) the employer took an adverse employment action against him; and (4) the position remained open or was filled by a person with similar qualifications." Kosereis v. Rhode Island, 331 F.3d 207, 212-13 (1st Cir. 2003) (citations omitted). After the plaintiff has established this prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. McDonnell Douglas, 411 U.S. at 802. If the defendant meets this requirement, the burden of production shifts back to the plaintiff, who must offer evidence showing that the defendant's proffered reason is pretext for discrimination. Id. at 804. While the McDonnell Douglas analysis thus shifts the burden of production, the burden of persuasion remains with the plaintiff at all times. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993).

Importantly, when an employer offers multiple legitimate, nondiscriminatory reasons for an adverse employment action, a plaintiff generally must offer evidence to counter each reason. In Rathbun v. Autozone, Inc., 361 F.3d 62, 79 (1st Cir. 2004), we upheld summary judgment for the defendant because the plaintiff's proffers, "[e]ven if fully credited . . . succeed only in calling into doubt one of several rationales that [the employer] has advanced for its decision."[20] Similarly, in Connell v. Bank of Boston, 924 F.2d 1169, 1177 (1st Cir. 1991), we found plaintiff's evidence insufficient when he had rebutted only one of his employer's two stated reasons for the adverse employment action.[21]

Our precedent is consistent with decisions in the other circuits. The Third Circuit has held that

> to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

---

[20] Although Rathbun involved claims filed under Rhode Island law, we analyzed the claims under the McDonnell Douglas burden-shifting framework. See Rathbun, 361 F.3d at 73.

[21] Connell involved an action under the Age Discrimination in Employment Act ("ADEA"). Although the Supreme Court has not yet decided whether the same framework applies to Title VII and ADEA claims, the courts of appeals have treated such claims similarly. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141-42 (2000)(collecting cases). We have also employed parallel approaches to such claims. See, e.g., Fontanez-Nunez v. Janssen Ortho LLC, 447 F.3d 50, 55 (1st Cir. 2006).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)(internal citations omitted); see also Bodenheimer v. PPG Indus., 5 F.3d 955, 958 (5th Cir. 1993). Similarly, the Seventh Circuit has held:

> [Plaintiff] has successfully demonstrated that genuine issues of material fact exist regarding four of the six reasons proffered by [defendant] for his dismissal. We conclude, however, that [plaintiff] has ultimately failed to carry his burden of showing pretext because the four reasons which he has successfully called into question are neither "so intertwined," nor "so fishy" as to call the remaining two reasons into doubt.

Wolf v. Buss (America) Inc., 77 F.3d 914 (7th Cir. 1996)(citation omitted). Thus, Sher must provide evidence that both the failure to cooperate charge and the sampling charge were pretext for discrimination.

We find that Sher has not met this burden with respect to the failure to cooperate charge. In his brief, he acknowledges that the VA has cited his failure to cooperate as a legitimate, nondiscriminatory reason for the adverse employment action, yet he fails to adduce any evidence whatsoever to show that this charge is pretext for discrimination. Moreover, our finding that Sher has failed to meet his burden on the failure to cooperate charge does not hinge on our conclusion that the MSPB was not arbitrary and capricious in agreeing with the VA that Sher violated agency regulations by failing to cooperate. Even if we were incorrect in this conclusion, the failure to cooperate charge may still serve as a legitimate, nondiscriminatory justification for the adverse

-35-

employment action, so long as Sher offers no evidence showing that the charge itself was pretext for discrimination. Sher bears the burden of persuasion on this issue, and he has failed to carry it.

Because Sher's showing on the failure to cooperate charge was inadequate, he necessarily cannot show that each of the VA's legitimate, nondiscriminatory reasons for his removal was pretext for discrimination.[22] Thus, in light of this failure, we find that the district court properly granted summary judgment to the VA on Sher's Title VII claim.

## VI.

The Federal Circuit has noted the "well-established rule of civil service law that the penalty for employee misconduct is

---

[22] After Desert Palace, Inc. v. Costa, 539 U.S. 90, 101-02 (2003), even without direct evidence of discrimination, Sher could have presented a mixed motive theory of discrimination rather than the single motive theory he has presented. In a mixed motive case, the plaintiff would only have to establish that national origin or religious discrimination was a motivating factor in the analysis, rather than the sole basis for the decision. See id. However, Sher has not pursued a mixed motive theory. Before the district court he proceeded under a single motive theory, permitting us to conclude that he must raise a genuine issue of material fact with respect to each of the VA's proffered legitimate nondiscriminatory reasons. Sher may have had good reasons for taking the approach he has chosen — for example, the remedies he would receive under the mixed motive approach would be more limited if the VA successfully asserted, as an affirmative defense, that it would have made the same decision even in the absence of the impermissible motivating factor. See, e.g., Weston-Smith v. Cooley Dickinson Hosp., Inc., 282 F.3d 60 (1st Cir. 2002)). However, Sher's failure to assert a mixed motive claim before the district court amounts to a waiver of the claim. See, e.g., Ramirez Rodriguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 78 n.12 (1st Cir. 2005); Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 31 (1st Cir. 2003).

left to the sound discretion of the agency." Miguel v. Dep't of the Army, 727 F.2d 1081, 1083 (Fed. Cir. 1984). Thus, "[i]t is only where the transgression is so minor, and a discharge based thereon 'so unduly harsh and unwarranted,' that the dismissal could be considered as constituting 'an abuse of discretion that demands redress by this court.'" Heffron v. United States, 405 F.2d 1307, 1312 (Ct. Cl. 1969) (citations and omissions omitted).

The penalty the VA imposed was not "unduly harsh." Courts have repeatedly held that removal from employment is justified for failure to cooperate with an investigation. See, e.g., Atwell, 286 F.3d at 991; Weston, 724 F.2d at 948. Since Sher was not even removed from employment, but rather received a forty-five day suspension, a demotion, and reduction in pay grade, the penalty falls within established reasonable bounds.

**Affirmed.**

**- Dissenting Opinion Follows -**

**STAHL**, **Senior Circuit Judge**, dissenting.  I write briefly in dissent because I believe that Sher had an objectively reasonable concern that his statements could be used against him in a subsequent prosecution, based on the inaccurate letter he received from the U.S. Attorney's Office.  Therefore, I would hold that the failure to cooperate charge impinges on Sher's Fifth Amendment right against self-incrimination and his rights under Garrity v. New Jersey, 385 U.S. 493 (1967).

In my view, Garrity and its progeny address two separate questions.  The first ("the immunity question") is whether a government employee's statements to his employer are in fact protected from use in subsequent criminal prosecutions.  The majority is correct that an employee's statements are protected by use immunity as soon as his employer requires him to speak under threat of losing his job.  See, e.g., Uniformed Sanitation Men v. Comm'r of Sanitation, 426 F.2d 619, 626 (2d Cir. 1970), cert. denied, 406 U.S. 961 (1972).  However, this question is not directly at issue in this case, as no subsequent prosecution was brought against Sher.

The second question ("the discipline question"), which Sher's appeal does implicate, is whether a government employee can be fired or otherwise disciplined for maintaining his silence in the face of his employer's questions.  The majority concludes that, at least where the employee is represented by counsel, he can be disciplined for maintaining his silence at the point that use

immunity attaches.  In other words, according to the majority, the immunity question and the discipline question are answered using the exact same test: once the employer requires a represented employee to answer questions under the threat of discharge, the employee automatically gets the benefit of use immunity (under the immunity question) and also is automatically obliged to answer questions or face discipline (under the discipline question).  This is true, the majority says, even where, as here, the employee declines to answer his employer's questions because he has an objectively reasonable fear that his statements will not in fact be protected by use immunity.

## A.        Which Rule Should Govern the Discipline Question?

Given the complexity of this area of the law, it is not surprising that the circuits are split as to whether a government employer is required to advise an employee of his rights and obligations before he can be disciplined for maintaining his silence.  As I read the cases, three circuits -- the Fifth, Eighth, and Eleventh -- have arguably held that the government employer does not have a disclosure obligation.  See Hill v. Johnson, 160 F.3d 469, 471-72 (8th Cir. 1998) ("[T]he mere failure affirmatively to offer immunity is not an impermissible attempt to compel a waiver of immunity."); Hester v. City of Milledgeville, 777 F.2d 1492, 1496 (11th Cir. 1985) ("We fail . . . to see how the city's failure to offer the plaintiffs use immunity could make any constitutional difference. . . . [A]ny grant of use immunity to the

plaintiffs would have been duplicative."); <u>Gulden</u> v. <u>McCorkle</u>, 680 F.2d 1070, 1075 (5th Cir. 1982), <u>cert.</u> <u>denied</u>, 459 U.S. 1206 (1983) ("Failure to tender immunity was simply not the equivalent of an impermissible compelled waiver of immunity."). However, even among these circuits, the answer at least in the Fifth and Eleventh circuits is not wholly clear.[23]

In contrast, three circuits -- the Second, Seventh, and the Federal Circuit[24] -- have concluded that the government has a

_____

[23]The cases cited address the question of whether immunity must be "tendered" to the employee by the government. They do not, however, address the somewhat different question, raised by Sher's appeal, of whether discipline is permitted where the employee remains silent because he has an objectively reasonable fear that his answers could be used against him in a later prosecution. The Fifth Circuit considered this question in <u>Arrington</u> v. <u>County of Dallas</u>, 970 F.2d 1441, 1446 (5th Cir. 1992), and concluded that, where the government allegedly warned the employee that his answers <u>could</u> be used against him in a subsequent prosecution, the employee was within his rights to remain silent and could not be disciplined for that choice. In addition, the Fifth Circuit's decision in <u>Gulden</u> did not reach the question of whether, had the employees actually attended a required polygraph examination, the government would have had an affirmative duty to advise them that "immunity was available." 680 F.2d at 1076. The Eleventh Circuit's approach on this issue is also less than clear. The <u>Hester</u> decision can be read as only addressing the immunity question (whether use immunity had attached where the employer did not "offer" such immunity) rather than the discipline question (whether the employee can be disciplined for maintaining his silence). <u>See</u> 777 F.2d at 1496. Also, the Eleventh Circuit has expressed concern, albeit in dicta, about employees who are unclear about the scope of their immunity when they decide whether to cooperate with an investigation. <u>See</u> <u>Benjamin</u> v. <u>City of Montgomery</u>, 785 F.2d 959, 962 (11th Cir. 1986) ("[W]e cannot require public employees to speculate whether their statements will later be excluded under <u>Garrity</u>.").

[24]Because, as the majority notes, most petitions for review of a final order of the Merit Systems Protection Board are filed in the Federal Circuit, <u>see</u> 5 U.S.C. § 7703(b)(1), close consideration of that court's approach in <u>Garrity</u> cases is instructive.

-40-

disclosure obligation.  See Atwell v. Lisle Park Dist., 286 F.3d 987, 990 (7th Cir. 2002) ("[T]he government employer who wants to ask an employee potentially incriminating questions must first warn him that because of the immunity to which the cases entitle him, he may not refuse to answer the questions on the ground that the answers may incriminate him."); Modrowski v. Dep't of Veterans Affairs, 252 F.3d 1344, 1351 (Fed. Cir. 2001) ("Invocation of the Garrity rule for compelling answers to pertinent questions about the performance of an employee's duties is adequately accomplished when that employee is duly advised of his options to answer under any immunity actually granted or remain silent and face dismissal."); Sanitation Men, 426 F.2d at 627 (permitting the firing of an employee for remaining silent where "only pertinent questions" are asked "about the performance of his duties" and he is "duly advised of his options and the consequences of his choice.").  In addition, the Tenth Circuit has suggested the same result in dicta.  See In re Grand Jury Subpoenas Dated December 7 and 8 v. United States, 40 F.3d 1096, 1102 n.5 (10th Cir. 1994), cert. denied, 514 U.S. 1107 (1995) ("While this case does not require us to decide whether the government must affirmatively advise [an employee of his rights under Garrity], other circuits arguably have adopted such a requirement.").

I would adopt the latter rule -- that the government employer has a disclosure obligation -- because it fulfills the inherently protective nature of the Supreme Court's decisions in

-41-

<u>Garrity</u> and its progeny.[25] While government employees may understand that they have a Fifth Amendment right to remain silent, they may not understand the complex exceptions to that rule under <u>Garrity</u>. See <u>Atwell</u>, 286 F.3d at 990. Thus, in my opinion, the rule adopted by the majority leaves government employees vulnerable to discipline when they believe they are simply exercising a basic constitutional right. Also, more ominously, the enunciated rule permits the government to fire an employee for maintaining his silence, even where the government makes incorrect, misleading, or threatening statements regarding the employee's rights. See <u>Hill</u>, 160 F.3d at 473 (Heaney, J., dissenting) ("As a practical matter, the majority's analysis impermissibly leaves public employees . . . uninformed and guessing as to how their statements may be used, what their constitutional rights are, and how to respond to ambiguous requests for statements, answers to questions, or polygraph examinations. I do not find this to be constitutionally allowable.").

I also take issue with the majority's decision not to adopt a firm rule to govern the discipline question. The majority declines to determine whether the government has a disclosure obligation, and instead bases its conclusion entirely on the fact

---

[25]The burden on the government under such a rule would be quite low. The Federal Circuit, for example, found sufficient the government employer's use of a standardized disclosure form as it was "a model of clarity" and "amply and fully conveyed" the employee's rights. See <u>Hanna</u> v. <u>Dep't of Labor</u>, 18 Fed. Appx. 787, 789-90 (Fed. Cir. 2001).

that Sher was accompanied by substitute counsel at his interview. For three reasons, I believe this is a flawed basis for the majority's conclusion. First, failing to adopt a clear rule leaves government employees in this circuit unsure of whether their employer is required to disclose their rights before they can be fired for remaining silent. This is just the kind of uncertainty that Garrity and its progeny intended to eliminate.

Second, the majority's legal basis for drawing the line at representation is weak. While the majority may be correct that "no circuit has held that an employee who is represented by counsel is entitled to notice from his employer of his Garrity immunity," it also seems true that no circuit has held the opposite. In other words, no circuit has drawn the line where the majority draws it today.

The majority cites two decisions -- Atwell, 286 F.3d at 990-91, and Modrowski, 252 F.3d at 1352 -- neither of which justifies its conclusion that a represented employee can be disciplined for maintaining his silence once use immunity has attached. First, the passage the majority cites from Atwell is pure dicta. See 286 F.3d at 991. In Atwell, the Seventh Circuit held that a discharged employee's Fifth Amendment right was not violated because the employee failed even to attend a scheduled investigative interview. See id. Though the court discussed the significance of the employee's legal representation in dicta, its decision did not turn on that fact.

-43-

The majority also cites the Federal Circuit's decision in Modrowski, a case that is inapposite to the majority's reasoning and conclusions. As a preliminary matter, Modrowski, unlike the majority here, required that the employer "duly advise" the employee of his rights before he could be disciplined for remaining silent, 252 F.3d at 1351, and also took account of the employee's reasonable belief regarding whether his statements would be used against him in a subsequent criminal prosecution, id. at 1350-51. Both of these rules are ones I would have adopted in this case. In addition, the Modrowski court reversed the employee's failure to cooperate charge for two primary reasons: (1) the declination to prosecute letter from the U.S. Attorney's Office was ambiguous in scope, and (2) the employee did not have full access to counsel. Id. at 1352-53. In my view, the same conditions obtained in Sher's case. The majority makes an error of logic when it concludes that, because Modrowski held that the employee should have had full access to counsel, it must logically follow that (a) full access to counsel would have relieved the government of any disclosure obligation, and (b) with full access to counsel, the employee's subjective view of his legal predicament would not have been relevant. These conclusions simply do not flow logically from Modrowski's concern that the employee could not make an informed decision, where, among other things, he was deprived of access to counsel. To say, as Modrowski did, that not having counsel deprives one of rights, is emphatically not the same as saying, as

-44-

the majority does, that having counsel automatically guarantees those rights.

The third problem with the majority's choice to base its decision solely on the fact of representation is that, in this case, the Veterans Administration (VA) investigators denied Sher's request to postpone his interview by a mere two days so his counsel of choice could attend the interview with him. This, despite the VA's written assurance that Sher was entitled to a representative of his choice. The VA's denial of Sher's reasonable postponement request forced him to attend the interview with his attorney's partner, who was not familiar with Sher's case or the relevant area of law. In sum, the majority has applied a novel legal rule to a questionable factual scenario, thus yielding a conclusion that permits public employers to discipline employees for maintaining their silence while unreasonably burdening their access to legal advice.

**B.      The Letter from the U.S. Attorney's Office**

Unlike the majority, because I believe the government has a disclosure obligation, I think the letter from the U.S. Attorney's Office is of crucial importance.[26] The letter stated that criminal prosecution had been declined as to three episodes of

---

[26]Even under the majority's rule, I believe that a represented employee who reasonably believes, based on the government's words and actions, that his statements may indeed be used against him, should not be punished for invoking his constitutional right to remain silent.

sampling by Sher. However, the letter included one date on which no sampling had occurred (February 2001) and did not mention two dates on which Sher had acknowledged requesting samples for personal use (June 2000, and December 2000). In other words, as in Modrowski, 252 F.3d at 1352, the scope of Sher's immunity was ambiguous and Sher had a reasonable basis to believe that his answers or their fruits could be used against him in a subsequent criminal prosecution. Therefore, he chose to invoke his right to remain silent pending clarification of the scope of his immunity.[27]

On the facts of this case, I would hold that the failure to cooperate charge violated Sher's Fifth Amendment right and his rights under Garrity.[28] Because of the inaccurate letter from the

_____

[27]It is worth noting that Sher had previously met with investigators on two occasions, without counsel, and had answered their questions in full. In addition, after Sher refused to answer questions at his third interview, his attorney sent two follow-up letters to the VA requesting clarification of the scope of his immunity and reiterating Sher's willingness to cooperate as long as his right against self-incrimination was protected.

[28]The majority dismisses Sher's claim that the punishment imposed upon him was an abuse of discretion because, the majority says, "[c]ourts have repeatedly held that removal from employment is justified for failure to cooperate with an investigation." However, the majority does not consider whether, if the failure to cooperate charge were not sustained, Sher's punishment would survive review based only on the sampling charge. Because I do not believe the failure to cooperate charge should be sustained, I would reexamine Sher's punishment on the sampling charge, in light of the Douglas factors. See Douglas v. Veterans Admin., 5 M.S.P.B. 313, 332 (1981). I would particularly consider the ninth Douglas factor -- the clarity with which the employee was on notice of any rules that were violated. Id. Sher maintains that his understanding of the Togus sampling policy was that it only barred giving drug samples to patients, but permitted employees to receive samples for personal use. Sher's understanding was echoed by

-46-

U.S. Attorney's Office, Sher had an objectively reasonable basis to believe that his statements could be used against him in a future prosecution.  The majority's view that the mere presence of an attorney, and a last minute replacement at that, means that we should close our eyes to the legitimately alarming impact that the letter had on Sher's understanding of his legal predicament, is unconvincing formalism and certainly not consistent with the protective nature of the Supreme Court's jurisprudence in this area.  I therefore respectfully dissent.

---

overwhelming testimony from numerous employees (both physicians and pharmacists) that they also understood that sampling for personal use was permitted.  Indeed, several witnesses testified that they had openly sampled for personal use, believing it was permissible.  Arguably, the Togus facility's written policy on sampling is consistent with the employees' understanding: "Due to Federal regulations regarding drug diversion, SAMPLING IS NOT PERMITTED within the Medical Center."  In other words, sampling as to patients was not allowed because Togus was concerned that patients who received drug samples might sell them for money ("drug diversion") instead of taking the medication themselves.  Thus, because the VA did not make clear to its employees that sampling for personal use was prohibited, I would reconsider Sher's punishment, based on the Douglas factors.